UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
JANE ROE,

                        Plaintiff,

          -against-

UNION COLLEGE, THE BOARD OF TRUSTEES
OF UNION COLLEGE,

                     Defendants.
--------------------------------------------------------------------X

**Civil Action No:** 1:19-CV-0909 (GTS/DJS)

**COMPLAINT**

      **PLAINTIFF JANE ROE**[1] (hereinafter referred to as "Plaintiff"), by her attorneys, Nesenoff and Miltenberg, LLP, whose offices are located at 363 Seventh Avenue, 5th Floor, New York, New York 10001, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

### THE PARTIES

      1.      At all times relevant to this Complaint, Plaintiff was and is a female citizen of the United States who resides in the State of New York.

      2.      At all times relevant to this Complaint, Defendant Union College (hereinafter "Defendant Union" or the "College") was and is a private institution of higher education with its campus located at 807 Union Street, Schenectady, New York 12308.

---

[1] Plaintiff herein files a motion for leave to file under a pseudonym. Plaintiff notes there is currently a case pending against Defendants captioned "Jane Doe v. Union College et al.," Case No. 19-CV-284. Accordingly, for the sake of clarity, Plaintiff here has elected to use Jane Roe.

3.     At all times relevant to this Complaint, Defendant Union received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a) (hereinafter "Title IX").

4.     According to published Union College Financial Statements for the fiscal year end June 30, 2018, Defendant Union received $2,550,466 in government grants, in addition to the federal student loan money it received.  Defendant Union also reported allocations for sponsored activities which included "various research and instructional programs funded by external parties including the federal government, state governments, and private foundations."  *See* Union College Financial Statement, June 30, 2018, available at https://www.union.edu/files/finance/201811/fs-18.pdf.

5.     At all times relevant to this Complaint, the Defendant Board of Trustees of Union College was and is comprised of thirty-five (35) members, including the president of the college, and as "a corporate body, has owned the College and been the College's designated legal representative throughout its history." *See* https://www.union.edu/about/leadership/trustees.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Plaintiff's claim(s) based on 28 U.S.C. §§ 1331 and 1332.

7.      Venue is proper in this case pursuant to 28 U.S.C § 1391(b)(2) because the events or omissions which give rise to Plaintiff's claims took place in Schenectady County, New York which is located in the Northern District of New York.

## FACTUAL ALLEGATIONS

**Plaintiff Begins Her First Semester at Union**

8.      Plaintiff commenced attending Union in or around September of 2015 as an incoming freshman student. Plaintiff was excited to begin her college experience and live independently for the first time away from home.

9.      On or about September 6, 2015, Plaintiff attended her first college party at Union.

10.      Prior to attending Union, Plaintiff did not have much, if any, experience drinking alcohol and in fact, had never had a drink of beer until that first party at Union.

11.      Following the September 6 party, Plaintiff created a tight-knit friend group with whom she frequently attended social events at and around campus. It was through this friend group that Plaintiff met a particular male student, "Assaulter Smith[2]."

12.      Throughout Plaintiff's first semester at Union, she and Assaulter Smith remained cordial acquaintances on campus. Though they did not develop a close friendship, they remained friendly and would always greet each other when they saw each other on campus or at social events.

13.      Following her first semester at Union, Plaintiff briefly returned home for the winter break, confident that she had chosen the right institution for her.

**Plaintiff Returns to Union and Reunites with Her Friends**

14.      Plaintiff was home for winter break from Thanksgiving 2015 until approximately January 3, 2016, when she returned to Union and moved back into her dorm room in Richmond House ("Richmond").

---

[2] For privacy purposes, Plaintiff's accused assaulter is named herein by pseudonym only.

15.     On or about January 6, 2016, Plaintiff was invited to a party, along with Assaulter Smith and a number of other Union students, by a mutual friend "JK". The party was being held at 203 Steward Place ("203 Steward") which was on Union's campus.

16.     Plaintiff accepted JK's invitation and began getting ready for the party. Plaintiff dressed in a flannel and tank top, paired with a pair of black jeans. Plaintiff then met and walked with JK to the party.

17.     When Plaintiff arrived at the party, she met up with two of her girlfriends, "ED" and "LD". Plaintiff, ED, and LD continued to hang out and drink at the party.

18.     While at 203 Steward, Plaintiff and her friends continued to drink alcohol and play drinking games with the other attendees. Plaintiff estimates that within approximately an hour at 203 Steward, she consumed the equivalent of approximately 11 shots of vodka and 5 cups of beers.

19.     At some point during the party at 203 Steward, Assaulter Smith walked up to Plaintiff, unannounced, and began to kiss Plaintiff on the lips.

20.     Plaintiff was shocked; she had never engaged in any semblance of romantic contact with Assaulter Smith before and certainly had never kissed him prior to the 203 Steward party. Plaintiff immediately pulled away and walked away from Assaulter Smith.

21.     Thereafter, JK approached Plaintiff and told her that he and some friends were leaving 203 Steward to go to a different party at an off-campus fraternity house located at 821 Union Street ("821 Union").

22.     Plaintiff decided to also leave and attend the party at 821 Union.

**Assaulter Smith Takes Advantage of Plaintiff in Her Vulnerable Inebriated State**

23.     While on the walk over to 821 Union, Plaintiff began to feel the significant effects of her alcohol consumption. Plaintiff was slurring her speech and found it increasingly more

difficult to keep her balance and coordination while walking. By the time Plaintiff reached 821 Union, she felt extremely drunk – she was not in control of her self and had difficulty being aware of her surroundings.

24.    When Plaintiff arrived at 821 Union, she noticed people dancing and decided to also dance. While she was on the dance floor, Plaintiff felt someone approach her. It was Assaulter Smith, who came up behind Plaintiff and began to "grind" on her, placing the full front of his body against the full back of Plaintiff's.

25.    Plaintiff tried to escape from Assaulter Smith but, due to the effects of her alcohol consumption, she was unable to do so. As Plaintiff attempted to get away from Assaulter Smith, she stumbled and lost her balance.

26.    Seeing Plaintiff struggle to get away, Assaulter Smith inched closer and closer towards her and continued to aggressively grind against Plaintiff.

27.    Assaulter Smith took full advantage of Plaintiff's vulnerable state and began to kiss her again on the dance floor. It was not until Plaintiff voiced that she felt ill that Assaulter Smith allowed her to leave the dance floor as he followed her away from the raucous party crowd.

28.    When Plaintiff and Assaulter Smith reached a quieter area of the party, Assaulter Smith asked Plaintiff if she was "feeling okay." Plaintiff responded that she was feeling sick and needed to go back to her dorm room.

**Assaulter Smith Takes Plaintiff Home and**
**Rapes Plaintiff in Her Dorm Room (the "Assault")**

29.    Assaulter Smith then proceeded to leave the party with Plaintiff and walk her back home to her dorm at Richmond.

30.     During the walk back to Richmond, Plaintiff found it extraordinarily difficult to walk without assistance and remembers shivering and stumbling multiple times throughout the walk.

31.     Due to the effects of her alcohol consumption, Plaintiff fell to the ground at least twice on the walk home to Richmond with Assaulter Smith. After the second time she fell, Assaulter Smith, entirely unprompted, grabbed Plaintiff off the floor, picked her up, and decided to carry her the rest of the way home to Richmond.

32.     After reaching Richmond, Assaulter Smith confiscated Plaintiff's identification card, swiped them into the building, and proceeded to carry Plaintiff to her dorm room door.

33.     After reaching Plaintiff's dorm room, Assaulter Smith put Plaintiff down to allow her to open the locked door. Plaintiff had little to no hand-eye coordination due to the effects of her alcohol consumption and struggled to open the door.

34.     Upon information and belief, Assaulter Smith became frustrated at Plaintiff's inability to open the door and thereafter took the keys from Plaintiff and opened her dorm room himself.

35.     Without invitation, Assaulter Smith followed Plaintiff inside her dorm room.

36.     Once inside her dorm room, a place Plaintiff should have felt and been safe, the full effects of Plaintiff's alcohol consumption set in. Plaintiff felt as though the room itself were violently spinning around her and her limbs felt heavy, as though they were made of lead.

37.     Plaintiff laid on her bed so as to steady herself but nothing could stop the symptoms she was feeling. Plaintiff soon became very sick and vomited into her nearby trashcan.

38.     Plaintiff began to panic and asked Assaulter Smith, "Will I be okay?" and "Am I going to die?" Plaintiff could tell that she was slurring her words. Assaulter Smith did not offer Plaintiff any response to her frantic and panicked questions.

39.     After Plaintiff vomited, she laid back down on her bed. At this point, seeing Plaintiff in her most vulnerable state, Assaulter Smith took it upon himself to attack her.

40.     Uninvited and without any semblance of consent from Plaintiff, Assaulter Smith proceeded to remove all of Plaintiff's clothing. Plaintiff wanted desperately to resist but found that she lacked the coordination and ability to stop him.

41.     After removing Plaintiff's clothing, Assaulter Smith proceeded to once again kiss Plaintiff and grope her body, paying particular attention to Plaintiff's breasts.

42.     At no point did Plaintiff ever indicate, either through words or actions, that she wanted or consented to being kissed or touched by Assaulter Smith. However, this did not matter to him; knowing that Plaintiff was helpless to fight him off, Assaulter Smith continued to sexually assault Plaintiff.

43.     Plaintiff tried to scream out for help and to tell Assaulter Smith to stop but Assaulter Smith unequivocally prevented her from doing so; Assaulter Smith covered Plaintiff's mouth with his hands and sinisterly told Plaintiff, "Don't worry, everything is going to be okay."

44.     Assaulter Smith then escalated his attack on Plaintiff's body. With his hand still covering Plaintiff's mouth so as to prevent her from calling out, Assaulter Smith continued to touch Plaintiff's body and digitally penetrated Plaintiff's vagina, again without consent.

45.     Plaintiff was helpless to fight back; she felt violated and disgusted at what was happening to her.

46.     Assaulter Smith continued to digitally rape Plaintiff for several minutes.

47.     After digitally penetrating Plaintiff, Assaulter Smith proceeded to remove his own clothing, climbed onto the bed on top of Plaintiff, and vaginally penetrated Plaintiff with his penis, once again without consent from Plaintiff.

48.     Assaulter Smith proceeded to vaginally rape Plaintiff in her dorm room over her continued objections. Upon information and belief, Plaintiff proceeded to black out.

**Assaulter Smith Attempts to Cover Up the Assault**
**And Convince Plaintiff That "Nothing Happened"**

49.     The morning after the Assault, Plaintiff awoke to find herself stark naked in her bed with Assaulter Smith lying next to her. Assaulter Smith was asleep, wearing only his underwear and cupping Plaintiff's bare breast in his hand.

50.     Plaintiff was extremely alarmed and had this sickening feeling in her stomach. Plaintiff had no recollection of what transpired the night before but felt as though something were terribly wrong.

51.     Plaintiff woke up Assaulter Smith and immediately asked, "What the hell happened last night?" Plaintiff continued to ask him "Did anything happen?" and told Assaulter Smith that she "didn't remember anything".

52.     In response, Assaulter Smith asked "You don't remember anything?" to which Plaintiff replied, "No."

53.     Upon information and belief, realizing that Plaintiff could not recall the assault and in an effort to cover up his crime, Assaulter Smith lied to Plaintiff. When asked what had happened the night prior, Assaulter Smith untruthfully told Plaintiff that nothing had happened between them.

54.     Assaulter Smith told Plaintiff that she had become sick the night prior because she had drunk too much. Assaulter Smith explained that he had "taken care of" Plaintiff but reiterated that nothing more happened.

55.     Assaulter Smith then got dressed and rushed out of Plaintiff's dorm room.

56.     After Assaulter Smith left, Plaintiff surveyed the state of her dorm room, and noticed her clothes strewn on the floor and the night's old vomit in her trashcan. Plaintiff was still very confused and uncomfortable about not remembering the previous night's events but decided to take a shower and continued onto class.

57.     Plaintiff resolved herself to believe Assaulter Smith that nothing had happened the night prior and went about her regular daily life as best she could; she attended classes, saw her friends, and even occasionally greeted Assaulter Smith on campus. However, Plaintiff always felt as though she were missing something and the uncertainty of what happened on the night of the Assault haunted her.

**Plaintiff Recalls the Assault in a Heartbreaking and Painful Flashback**

58.     On or about April 14, 2016, while Plaintiff was on her way to visit her then-boyfriend "Boyfriend JJ", Plaintiff passed by Union's library where she noticed Assaulter Smith.

59.     Being friendly, Plaintiff approached Assaulter Smith and said hi to him. At such time, Assaulter Smith gave Plaintiff a hug and, while doing so, suddenly grabbed Plaintiff's buttocks.

60.     Plaintiff was alarmed by Assaulter Smith's forwardness; she quickly rushed away to see Boyfriend JJ.

61.     After reaching her Boyfriend JJ's room, Plaintiff described, in tears, to him that Assaulter Smith had grabbed her butt just moments ago. Plaintiff was extremely upset about the incident and Boyfriend JJ did everything he could to calm her down.

62.     Little did Plaintiff know, she was about to experience the worst 24-hours of her life as Assaulter Smith's act of groping Plaintiff's body in front of the library opened an onslaught of, until then, upon information and belief, repressed memories of the Assault.

63.     Over the next 24 hours, Plaintiff experienced heartbreaking and painful flashbacks of the Assault, remembering the harrowing incident in detailed flashes. Plaintiff was distraught; she was petrified of staying in her dorm room where she was violently raped and yet, while staying with Boyfriend JJ, she could not bear for him to touch or at times even look at her.

64.     Since the day Plaintiff was raped by Assaulter Smith, Plaintiff has experienced what has been since diagnosed as Post-Traumatic Stress Disorder ("PTSD") flashbacks of the Assault. Plaintiff would often burst into tears remembering what Assaulter Smith had done to her and felt extremely unsafe around all men.[3]

65.     After her first PTSD flashback, Boyfriend JJ escorted Plaintiff to Union's Wicker Wellness Center (the "Center"). At the Center, Plaintiff met with a counselor who she continued to treat with regarding the Assault and the resulting emotional and mental trauma she suffered.

66.     Notably, no one at the Center ever offered or advised Plaintiff of further services and resources, such as STD testing or ways to report the Assault to Union.

67.     Plaintiff would continue to treat at the Center until her last day as a student at Union.

---

[3] Plaintiff continues to suffer from PTSD flashbacks.

**Boyfriend JJ Reports the Assault to Union and**
**Plaintiff Meets with Union's Title IX Representative**

68.     On or about April 18, 2016, Boyfriend JJ met with Union's Dean Stephen Leavitt ("Dean Leavitt") to report that Plaintiff had been sexually assaulted. Dean Leavitt advised Boyfriend JJ to have Plaintiff meet with Melissa Kelley, Union's then Title IX Coordinator ("Coordinator Kelley").

69.     The week after her initial recall, Plaintiff met with Union's Dean Trish Williams ("Dean Williams") and Coordinator Kelley to discuss the Assault. Plaintiff told Dean Williams and Coordinator Kelley exactly what she could remember about the Assault but declined to name her assaulter or identify any Union students at that time.

70.     Plaintiff advised that she was not yet comfortable with the idea of moving forward with an investigation and possible hearing. Dean Leavitt advised that Union could and would do nothing her sexual assault report unless she went forward with a formal complaint against Assaulter Smith.

71.     A few days later, Plaintiff met for a second time with Dean Williams and Coordinator Kelley to submit a formal complaint and request for a Title IX investigation. During this meeting, Plaintiff identified her assaulter – Assaulter Smith – and asked that an investigation be initiated.

72.     In response, Coordinator Kelley advised Plaintiff of Union's policy and procedures regarding sexual assaults, had Plaintiff sign a confidentiality order and No Contact Order, and asked that Plaintiff provide a list of potential witnesses and a summary of the events (meaning the Assault).

73.     Plaintiff signed the necessary agreements and timely provided the requested information to Coordinator Kelley and Dean Leavitt.

**Union's Sexual Misconduct Policy ("the Policy")**[4]

74.   Union's Policy provided, in relevant part:

### I.   *Sexual or Gender-Based Harassment*

"Harassment" is conduct that creates an intimidating, offensive, or hostile working or learning environment or that unreasonably interferes with work or academic performance based on a person's protected status, including sex []. All such conduct if unlawful.

"Gender-Based Harassment" is harassment based on sex … which may include acts of aggression, intimidation, or hostility, whether verbal, physical, graphic, or otherwise. To qualify as Gender-Based Harassment, the conduct need not involve conduct of a sexual nature.

…

Hostile Environment. A hostile environment exists when the conduct is sufficiently severe, pervasive, or persistent that it unreasonably interferes with, limits, or deprives an individual from participating in or benefiting from [Union's] education or employment programs and/or activities. Whether conduct is sufficiently severe, pervasive, or persistent is determined by using an objective standard of a reasonable person as well as the subjective standard of the Complainant.

Harassing conduct can take many forms. The determination of whether an environment is hostile is based on the totality of the circumstances, including but not limited to: (1) the frequency of the conduct; (2) the nature and severity of the conduct; (3) whether the conduct was physically threatening; (40 the effect of the conduct on Complainant's mental or emotional state, with consideration of whether the conduct unreasonably interfered with the Complainant's educational or work performance and/or [Union] programs or activities; (5) whether the conduct was directed at more than one person; (6) whether the conduct arose in the context of other disciplinary conduct; and (70 whether the conduct in question is legally protected by academic freedom in accordance with the Academic Freedom policy…

---

[4] Plaintiff notes that the following provisions were taken from the 2017-2018 Union College Sexual Misconduct Policy. Upon information and belief, Union's 2017-2018 Policy mirrored Union's 2015-2016 Policy.

A single isolated incident may create a hostile environment if the incident is sufficiently severe, particularly if the conduct is physical. A single incident of Sexual Assault, for example, may be sufficiently severe to constitute a hostile environment.

Sexual or Gender-Based Harassment:

- May be blatant and intentional and involve an over action, a threat or reprisal, or may be subtle and indirect, with a coercive aspect that is unstated.

- May be committed by anyone, regardless of gender, age, position or authority.

- May be committed by a stranger, an acquaintance, or someone with whom the complainant has an intimate or sexual relationship.

- May be committed by or against an individual or mat be a result of the actions of an organization or group.

- May occur by or against an individual of any sex, sexual orientation, gender identity, or gender expression.

- May occur in the classroom, in the workplace, in residential settings, or in any other setting.

- May be a one-time event or can be part of a pattern of behavior.

- May be committed in the presence of others or when the Parties are alone.

- May affect the Complainant and/or Third Parties who witness or observe harassment and are affected by it.

Examples of conduct that may constitute Sexual Harassment as defined above may include a severe, persistent or pervasive pattern of unwelcome conduct that includes one or more of the following:

- Physical conduct, including unwelcome touching, sexual/physical assault, impeding, restraining, or blocking movements, or unwanted sexual advances;

- Verbal conduct, including making or using derogatory comments, epithets, slurs or humor; verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, suggestive or obscene letters, notes, or invitations; or objectively offensive comments of a sexual nature, including persistent or pervasive sexually explicit statements, questions, jokes, or anecdotes;

- Visual Conduct, including leering, making sexual gestures, displaying of suggestive objects or pictures, cartoons, or posters in a public space or forum; or severe, persistent, or pervasive visual displays of suggestive, erotic, or degrading sexually oriented images that are not pedagogically appropriate;

- Written Conduct

- Quid pro quo conduct.

## II. *Sexual Assault*

Sexual Assault is having or attempting to have sexual intercourse with another individual:

- By force or threat of force;

- Without effective affirmative consent; or

- When that individual is incapacitated.

Sexual assault refers to any sexual penetration (anal, oral, or vaginal), however slight, with any object, or sexual intercourse by a man or woman upon a man or woman without consent. Sexual penetration includes vaginal or anal penetration by a penis, tongue, finger, or object or oral copulation by mouth to genital contact or genital to mouth contact.

## III. *Non-Consensual Sexual Contact*

Non-Consensual Sexual Contact is having sexual contact with another individual:

- By force or threat of force;

- Without effective affirmative consent; or

- When that individual is incapacitated.

Non-Consensual Sexual Contact includes intentional contact with the intimate parts of another, causing an individual to touch their own intimate body parts, or disrobing or exposure of another without permission. Intimate body parts may include the breasts, genitals, buttocks, groin, mouth or any other part of the body that is touched in a sexual manner.

### IV.    *Stalking*

Stalking occurs when a person engages in a course of conduct directed at a specific person that would cause a reasonable person to fear for their safety or the safety of others or suffer substantial emotional distress.

*A course of conduct* consists of two or more acts, including, but not limited to, acts in which a person directly, indirectly, or through third Parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property.

*Reasonable person* means a reasonable person under similar circumstances and with similar identities to the Complainant.

*Substantial emotional distress* means significant mental suffering or anguish that may, but does not necessarily, require medical or other professional treatment or counseling.

…

Examples of stalking include, but are not limited to:

- Non-consensual communication including in-person communication, telephone calls, voice messages, text messages, email messages, social networking site postings, instant messages, posting of pictures or information on web sites, written letters, gifts, or any other communications that are undesired and/or place another person in fear;

- Following, pursuing, waiting, showing up uninvited at a workplace, place of residence, classroom, or other locations frequented by a person;

- Surveillance and other types of observation, whether by physical proximity or electronic means; and

- Gathering information about a person from family, friends, co-workers, and/or classmates.

To qualify as stalking, the conduct is not required to be sexual in nature.

## V.   Key Terms: Affirmative Consent, Force, Intimidation, Coercion, Incapacitation

### 1.   Affirmative Consent

Under New York law, affirmative consent means: knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity. Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression.

- Consent to any sexual act or prior consensual sexual activity between or with any party does not necessarily constitute consent to any other sexual act.

- Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

- Consent may be initially given but withdrawn at any time.

- Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual otherwise cannot consent. Depending on the degree of intoxication, someone who is under the influence of alcohol, drugs, or other intoxicants may be incapacitated and therefore unable to consent.

- Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm.

- When consent is withdrawn or can no longer be given, sexual activity must stop.

### 2. Force

Force is the use or threat of physical violence to overcome an individual's freedom of will to choose whether or not to participate in sexual activity or provide consent. Consent obtained by force is not valid.

For the use of force to be demonstrated, there is no requirement that a Complainant resist the sexual advance or request. However, evidence of resistance by the Complainant will be viewed as a clear demonstration of a lack of consent.

### 3. Intimidation

Intimidation is the use of implied threats to overcome an individual's freedom of will to choose whether or not to participate in sexual activity or provide consent. Consent obtained by intimidation is not valid.

### 4. Coercion

Coercion is the improper use of pressure to compel another individual to initiate or continue sexual activity against that individual's will. Consent obtained through coercion is not valid.

Coercion can include a wide range of behaviors, including intimidation, manipulation, threats, and blackmail. A person's words or conduct are sufficient to constitute coercion if they wrongfully impair another individual's freedom of will and ability to choose whether or not to engage in sexual activity. Examples of coercion include threatening to "out" someone based on sexual orientation, gender identity, or gender expression and threatening to harm oneself if the other Party does not engage in the sexual activity. When someone indicates, verbally or physically, that they do not want to engage in a particular sexual activity, that they want to stop a particular activity, or that they do not want to go past a certain point of sexual interaction, continued activity or pressure to continue beyond that point can be coercive. [Union] will evaluate the following in determining whether coercion was used: (a) the frequency of the application of pressure, (b) the intensity of the pressure, (c) the degree of isolation of the person being pressured, and (4) the duration of the pressure.

### 5. Incapacitation

Incapacitation is a state where an individual cannot make an informed and rational decision to engage in sexual activity because of a lack of conscious understanding of the fact, nature, or extent of the act (e.g., to understand the who, what, when,

where, why, or how of the sexual interaction) and/or is physically helpless. For example, an individual is incapacitated, and therefore unable to give consent, if the individual is asleep, unconscious, or otherwise unaware that sexual activity is occurring. An individual will also be considered incapacitated if the person cannot understand the nature of the activity or communicate due to a mental or physical condition.

Incapacitation may result from the use of alcohol, drugs, or other medication. Consumption of alcohol or other drugs alone is insufficient to establish incapacitation.

The impact of alcohol and drugs varies from person to person, and evaluating incapacitation requires an assessment of how the consumption of alcohol and/or drugs impacts an individual's: (1) decision-making ability; (2) awareness of consequences; (3) ability to make informed judgments; or (4) capacity to appreciate the nature and the quality of the act.

It shall not be a valid excuse that the Respondent believed that the Complainant affirmatively consented to the sexual activity if the Respondent knew or reasonably should have known that the Complainant was unable to consent to the sexual activity under any of the following circumstances: (a) the Complainant was asleep or unconscious; (b) the Complainant was incapacitated due to the influence of drugs, alcohol, or medication, so that the Complainant could not understand the fact, nature, or extent of the sexual activity; (c) the Complainant was unable to communicate due to a mental or physical condition.

Whether the Respondent reasonably should have known that the Complainant was incapacitated will be evaluated using an objective reasonable person standard. The fact that the Respondent was actually unaware of the Complainant's incapacity is irrelevant to this analysis, particularly where the Respondent's failure to appreciate the Complainant's incapacitation resulted from the Respondent's failure to take reasonable steps to determine the Complainant's incapacitation or where the Respondent's own incapacitation (from alcohol or drugs) caused the Respondent to misjudge the Complainant's incapacity.

It is the responsibility of each Party to be aware of the intoxication level of the other Party before engaging in sexual activity. In general, sexual activity while under the influence of alcohol or other drugs poses a risk to all Parties. If there is any doubt as to the level or extent of the other individual's intoxication, it is safest to forgo or cease any sexual contact or activity.

Being intoxicated by drugs or alcohol is no defense to any violation of this Policy and does not diminish one's responsibility to obtain consent.

## VI.   *Retaliation*

Retaliation includes adverse action taken against a person for making a good faith report of Prohibited Conduct or participating in any proceeding under this Policy. Adverse action includes conduct that threatens, intimidates, harasses, coerces or in any other way seeks to discourage a reasonable person from engaging in activity protected under this Policy. Retaliation can be committed by or against any individual or group of individuals, not just a Respondent or Complainant. Retaliation does not include good faith actions lawfully pursued in response to a report of Prohibited Conduct. Retaliation may be present even where there is a finding of "no responsibility" on the allegations of Prohibited Conduct.

[Union] will take immediate and responsive action to any report of retaliation and will pursue disciplinary action as appropriate. An individual reporting Prohibited Conduct is entitled to protection from any form of retaliation following a report that is made in good faith, even if the report is later not proved.

## VII.   *Interim Measures, Remedies, and Accomodations*

Upon receipt of a report, [Union] will impose reasonable and appropriate interim measures designed to eliminate the hostile environment and protect the parties involved. [Union] will make reasonable efforts to communicate with the parties to ensure that all safety, emotional and physical well-being concerns are being addressed. Interim measures may be imposed regardless of whether formal disciplinary action is sought by the Complainant of [Union].

A complainant or respondent may request a No Contact Order or other protection, or [Union] may choose to impose interim measures at it discretion to ensure the safety of all parties, the broader [Union] community and/or the integrity of the process.

All individuals are encouraged to report concerns about failure of another individual to abide by any restrictions imposed by an interim measure. [Union] will take immediate and responsive action to enforce a previously implemented measure.

75. With respect to the process for investigating and adjudicating complaints of sexual assault, the Policy provided:

### VIII.    *Sexual Misconduct Adjudication Process*

Formal Resolution of a complaint under this policy will occur through the use of an Adjudication Panel. A brief outline of the process is provided below. A description of each step in the process is outlined thereafter.

1. Initiating the Disciplinary Process
2. Responding to a Disciplinary Complaint
3. Fact Finding Investigation
4. Investigative Report
5. Document Review
6. Notice of Charges
7. Notice of Adjudication
8. Panel Adjudication/Decision
9. Sanctions
10. Outcome Letter
11. Appeals
12. Concerns about the Implementation of this Policy
13. Integrity of Process
14. Conclusion of Case

*a)  Complainant's Statement*

For a Complainant to file a disciplinary complaint against a student, the Complainant must submit a written statement detailing the allegations of the sexual misconduct. This statement is the first opportunity for the Complainant to describe the allegations against the Respondent….

The Complainant's Statement is one of the most important documents to be considered in the Sexual Misconduct Adjudication Process….

The Respondent will not be allowed to see the Complainant's Statement until **after** the Respondent has filed their statement in response to the original Complaint Form. Once the Respondent has submitted their statement, they will be given a copy of the Complainant's Statement. The Complainant will also be given a copy of the Respondent's Statement. (emphasis in original).

*b) No Contact Order*

Upon the initiation of a complaint under the Sexual Misconduct Adjudication Process, a "No Contact order" will be put into place between the Complainant and Respondent by the Senior Associate Dean of Students/Director of Student Conduct. The no Contact Order will bar any communication or contact between the Complainant and Respondent and will prohibit any interaction or exchange between them, either directly or through others… A No Contact order can be kept in place after the conclusion of the Sexual misconduct Adjudication Process. **In cases where a demonstrated violation of the No Contact order has been shown, the responsible party may be separated from [Union] pending the final resolution of the disciplinary complaint as an interim measure.** (emphasis in original).

*c) Respondent's Statement*

If the Respondent does not accept liability, they will be asked to provide a written response to the information contained in the Complaint Form. The Respondent's Statement must be submitted to the Title IX Coordinator within seven (7) days after the meeting with the Title IX Team… Once the Respondent has submitted their statement, the Respondent will be given a copy of the Complainant's Statement. The Complainant will also be given a copy of the Respondent's Statement.

## IX.   *Fact Finding Investigation*

After both parties have submitted their statements to the Title IX Coordinator, the Title IX Coordinator will initiate a Fact-Finding Investigation, utilizing [Union's] neutral investigators. It is the responsibility of the Investigator(s), not the parties, to father the evidence relevant to the Complaint and the facts raised in the parties' statement, to the extent reasonably possible. [] In all cases, the Investigator(s) will conduct an impartial investigation into the allegations of the disciplinary complaint, reviewing all evidence deemed to be relevant.

…

## X.   *Investigative Report*

Once the Fact Finding Investigation has been completes, the Investigator(s) will evaluate the information obtained during this process. The Investigator(s) will prepare a report summarizing and analyzing the relevant facts received through the Investigation, noting any supporting documentation or statements…

Once the report is finalized, it will be provided to both the Complainant and the Respondent for review. [] The final report will be made available to the Sexual Misconduct Adjudication panel…

### XI.   Document Review

Both the complainant and the Respondent will be provided the opportunity to review the final investigative report…

Any requested changes or concerns must be submitted in writing to the Senior Associate Dean of Students by the respective parties within two (2) days of reviewing the document(s). [] The senior Associate Dean of Students, in consultation with the Title IX Coordinator, will provide a copy of the final investigative report to the Adjudication Panel.

### XII.   Panel Adjudication/Decision

Upon determining that all the issues regarding the disciplinary complaint have been fully investigated and adequately addressed the Title IX Coordinator and the Chair of the Adjudication Panel will select four (4) members to serve on the Panel.

The Adjudication Panel is typically composed of two (20 faculty or staff members, two (2) students, and the chair, a Senior Student Affairs Administrator. Each member, including the chair, will have an equal vote. A quorum of the Adjudication Panel shall consist of the chair, and two (2) panel members.

The Adjudication Panel will have the responsibility to determine (1) whether [Union's] Policy has been violated and (2) what recommended disciplinary action should be imposed if [the Policy] is found to have been violated.

…

## Union's Noted Shortcomings in Conducting Title IX Investigations

76.     Just one year prior to Plaintiff's Assault, on or about September 16, 2015, the U.S. Department of Education Office for Civil Rights ("OCR") opened an investigation into a complaint filed against Union for its alleged mishandling of a complaint of sexual assault.

77.     Specifically, on or about July 30, 2015, the OCR received a complaint regarding the failure of Union to provide a prompt and equitable response to an allegation of sexual assault.

78.     The OCR determined, because Union is a recipient of federal financial assistance, that the OCR had jurisdiction to pursue an investigation, not only of the July 30, 2015 complaint, but into "whether the college promptly and equitably responded to all complaints, reports, and/or

incidents of sexual assault/violence of which it had notice; and as a result, students at the College, including the complainant, were subjected to a sexually hostile environment."

79.     The 2015 OCR investigation is currently ongoing.

80.     Moreover, upon information and belief, for years preceding Plaintiff's Assault, the College has willfully ignored and/or mishandled complaints of sexual misconduct on campus to the direct and purposeful detriment of its female students and complainants.

81.     By way of example only, upon information and belief, for the past several years, no less than five (5) woman have reported their experiences of sexual assault to the College in the hopes that their complaints would be properly investigated and handled by Union.

82.     Instead, upon information and belief, these women's complaints fell on deaf ears, with the College sometimes even telling the complainants that it refused to look into their assaults at all. This resulted in not only the perpetrators getting away with sexual assault and/or misconduct, but also led to the female victim's continued torment at the College.

83.     Furthermore, upon information and belief, the College has, and continues to have, a policy of covering up complaints and instances of sexual misconduct on campus, going so far as to discourage victims from seeking outside resources or involving outside agencies such as the local police. Upon information and belief, the College's policy with respect to the handling of sexual assault cases is to keep it quiet and internal – leading often times to the further victimization of its female students.

**<u>Assaulter Smith Torments Plaintiff on Campus</u>**

84.     Upon information and belief, shortly after Plaintiff filed her Title IX Complaint at Union, Assaulter Smith was advised of the allegations against him and also made to sign Confidentiality and No Contact orders.

85.     Despite the mandate that the proceedings remain confidential, upon information and belief, Assaulter Smith told a multitude of people about Plaintiff's allegations against him. Thereafter, Assaulter Smith, along with many of his friends at Union, began a slanderous and torturous campaign against Plaintiff.

86.     Soon after filing her formal complaint, Plaintiff began to hear disgusting rumors about her being "crazy" around campus.

87.     Plaintiff was outright targeted on campus and called a "slut" and a "whore" by her fellow Union students, many of which were friends of Assaulter Smith. Plaintiff was "slut shamed"[5] for the Assault every time she left her dorm room.

88.     Plaintiff dutifully advised Union of this ongoing harassment however Union failed to sufficiently intervene.

89.     By way of example, when Plaintiff advised Dean Williams of this ongoing harassment, Dean Williams did not give Plaintiff a reaction.

90.     By way of further example, when Plaintiff advised Dean Levitt of the ongoing harassment, Dean Levitt simply advised Plaintiff to speak with Coordinator Kelley. When Plaintiff advised Coordinator Kelley of this ongoing harassment, Coordinator Kelley, simply advised that she would look into it. To Plaintiff's knowledge, however, nothing was ever done to investigate the ongoing harassment and it was allowed to continue.

91.     Plaintiff was forced to live out the remainder of the Spring 2016 semester under extreme stress and anxiety, as she was daily harassed and tormented by Union students for being a rape victim.

---

[5] The term "slut-shamed" is colloquially used to describe the act of making someone feel embarrassed or ashamed following a sexual encounter.

92.     As a result, Plaintiff found herself being not as engaged in her academics which resulted in lower grades in her classes; Plaintiff withdrew from all social engagements, isolated herself from the Union community, and found it extremely difficult to even get out of bed each day.

**Union Initiates an Investigation into Plaintiff's Title IX Complaint Against Assaulter Smith**

93.     Union assigned two investigators, Laura Munkes and Thomas Constantine (collectively the "Investigators"), to investigate Plaintiff's Title IX complaint.

94.     Upon information and belief, the Investigators' responsibility was to thoroughly, objectively, and impartially investigate Plaintiff's Title IX complaint against Assaulter Smith.

95.     Despite this, however, the Investigators proceeded to conduct a clearly biased investigation, offering Assaulter Smith the benefit of every doubt throughout their inquiry, culminating in catastrophic results for Plaintiff.

96.     By way of example, upon information and belief, the Investigators began their investigation by scheduling interviews with the parties involved and any potential witnesses.

97.     Curiously, although it was *her* complaint, the Investigators, upon information and belief, intentionally, chose not to interview Plaintiff first.

98.     Instead, without having learned the details of Plaintiff's complaint from Plaintiff first, the Investigators determined to first interview the respondent, Assaulter Smith, and then confronted Plaintiff with the information they had learned during his interview.

99.     Notably, throughout the investigation, the Investigators failed to interview key witnesses in support of Plaintiff's complaint, including one witness who would have been able to corroborate Plaintiff's moment of recall in April of 2016.

100.     In addition, the Investigators appeared to spend an inordinate amount of time and energy probing Plaintiff's past drinking and partying habits, and included in their report   The Investigators included in their investigative report, information seemingly unrelated to Plaintiff's intoxication level on the night of the Assault as a means to degrade her credibility as a complainant.

101.     Moreover, the Investigators included damning and demeaning character "evidence" against Plaintiff in their investigative report, and, upon information and belief, excluded positive character evidence gathered during their investigation in an effort to make Plaintiff look less credible.

102.     Further, upon information and belief, the Investigators intentionally failed to investigate Assaulter Smith's defenses to the charges, instead opting to accept Assaulter Smith's assertions as infallible truth.

103.     By way of example, in response to Plaintiff's rape allegations, Assaulter Smith apparently reported to the Investigators that he was physically incapable of getting or sustaining an erection with a woman unless he were in a long-term relationship with her.

104.     In response, the Investigators did absolutely nothing to investigate the truth of Assaulter Smith's physiologically impractical claim, choosing instead to represent and treat such assertion as a medically viable defense to refute Plaintiff's complaint.

105.     Moreover, similar to Dean Williams, Dean Leavitt, and Coordinator Kelley, the Investigators ignored the ongoing harassment Plaintiff was subjected to on campus.

106.     During the investigation, Plaintiff shared with the Investigators that she had been subjected to continuing sexual harassment and bullying related to her Title IX complaint against Assaulter Smith. In response, the Investigators seemed disinterested and did not delve into Plaintiff's complaint about ongoing harassment in much, if any, detail.

107.    Throughout the investigation, Union kept Plaintiff woefully uninformed, failing entirely to advise Plaintiff of which witnesses were interviewed or what evidence was gathered throughout the Investigators' inquiry. Plaintiff had barely, if any, contact with the Investigators throughout the process other than at her interview.

108.    Indeed, it was not until the eve of the Title IX hearing to adjudicate Plaintiff's complaint that Plaintiff ever saw an investigative report; Plaintiff was not provided with a preliminary or draft report to review and was instead provided just one final report for which she could not submit comments to.

**Plaintiff Is Forced to Adjourn the Title IX Hearing to Accommodate Assaulter Smith**

109.    On or about July 15, 2016, Plaintiff returned to Union with her advisor to participate in a hearing to adjudicate her Title IX Complaint before a Hearing Panel.

110.    Plaintiff had been told by Dean Williams that Assaulter Smith was instructed to enter the building at Union from a designated entrance separate from where Plaintiff was scheduled to enter the building.

111.    Upon information and belief, this mandate was to prevent Assaulter Smith and Plaintiff from seeing each other prior to, during, or after the hearing. Upon information and belief, however, Union took no measures to make sure this arrangement was properly executed.

112.    On the day of the hearing, Plaintiff observed Assaulter Smith using the wrong entrance and elevator immediately prior to the scheduled hearing. Upon information and belief, Assaulter Smith intentionally used the wrong entrance to force Plaintiff to see him before the hearing.

113.    Seeing Assaulter Smith before the hearing was extremely distressing for Plaintiff and only served to make her feel uneasy before an incredibly important step in her Title IX process.

114.     Assaulter Smith's strategy to keep Plaintiff on edge, however, proved moot as the hearing was forcibly adjourned after Assaulter Smith's advisor failed to appear.

115.     Specifically, after waiting approximately 20 minutes for the hearing to start, Plaintiff and her advisor were approached by Dean Williams who informed them that Assaulter Smith's attorney was unable to attend that day's proceedings.

116.     Dismayed that she had apparently wasted her time waiting around at the pre-scheduled hearing, Plaintiff agreed to postpone the hearing for a date that Assaulter Smith's attorney could attend.

**Plaintiff Returns to Union for the Re-Scheduled Hearing**

117.     Plaintiff and her advisor returned to Union for the rescheduled hearing on July 18, 2016.

118.     During the hearing, Plaintiff and Assaulter Smith remained in separate rooms. However, during the times that Plaintiff was in a separate room from the Hearing Panel, a live video stream of her and her advisor was broadcast into the hearing room, allowing Assaulter Smith and his attorney to observe her throughout the proceedings. Likewise, while Assaulter Smith was outside of the hearing room, a live stream of him and his advisor was displayed directly behind Plaintiff in the hearing room.

119.     Throughout the hearing, the Hearing Panel displayed outright hostility towards Plaintiff while openly favoring Assaulter Smith.

120.     By way of example, throughout the hearing, the Hearing Chair, Union's then Associate Dean of Students Tom McEvoy ("Hearing Chair McEvoy"), repeatedly berated Plaintiff's advisor for allegedly speaking during the proceedings. In contrast however, Assaulter Smith's advisor – a trained attorney – was allowed to obnoxiously interject and speak for his client

multiple times throughout the day's proceedings without any reprimand or correction from Hearing Chair McEvoy.

121.   Moreover, the Hearing Panel permitted Assaulter Smith, as well as his witnesses, to introduce slanderous evidence and testimony at the hearing in a blatant effort to undermine and attack Plaintiff's character, going so far as to introduce private and personal information about Plaintiff <u>and her mother</u> which bore no relevance to Plaintiff's Title IX Complaint.

122.   In contrast, Plaintiff was unequivocally told that she could not introduce any character evidence or witnesses to either (i) rehabilitate her character or (ii) to shed light on Assaulter Smith's character.

123.   During the hearing, both Plaintiff and Assaulter Smith were permitted to ask questions of each other, the, and the witnesses. Notably, during questioning, Assaulter Smith admitted that <u>he knew Plaintiff was far too intoxicated to consent</u> to anything after she vomited into the trashcan.

## Union Clears Assaulter Smith of Any Wrongdoing

124.   Amazingly, despite glaring inconsistencies in the investigative report and Assaulter Smith's admissions during the hearing, Union found Assaulter Smith not responsible for raping Plaintiff.

125.   In support of the Hearing Panel's decision, articulated to Plaintiff via letter dated July 26, 2016, the Hearing Panel all but accepted Assaulter Smith's telling of events in its entirety and accused Plaintiff of not only consenting to the sexual contact, but of <u>asking for it</u>.

126.   Plaintiff was flabbergasted by the results of the hearing and promptly appealed the decision. Sadly, however, Plaintiff's appeal was denied and she was left with no further recourse.

**Union Allows Assaulter Smith to Torment and Harass**
**Plaintiff to the Point She Must Leave Campus**

127.    Plaintiff returned to Union for the 2016-2017 academic year and moved into her new dorm in Union's Beuth building ("Beuth").

128.    Although Assaulter Smith had been found not responsible for the Assault, the No Contact Order between him and Plaintiff remained in effect and had been updated to reflect their new dorm assignments for the 2016-2017 academic year.

129.    While moving into Beuth, Plaintiff heard a familiar voice outside of her dorm window; it was Assaulter Smith. He was walking past Plaintiff's dorm and had stated to his friend "I can't believe that bitch is still here after I won the case."

130.    Thereafter, throughout the remainder of the Fall 2016 semester, Assaulter Smith intentionally tormented, harassed, and stalked Plaintiff in an obvious effort to make her miserable on campus.

131.    Assaulter Smith and his friends would publicly scream "whore", "slut", and "liar" at Plaintiff on campus, and would refer to Plaintiff as "the girl who tried to get a nice guy in trouble." Such comments were made not only around Union's campus but even in the classroom, making it virtually impossible for Plaintiff to enjoy a harmonious educational environment and significantly affecting Plaintiff not just emotionally and mentally, but also academically.

132.    Plaintiff dutifully reported Assaulter Smith's disgusting behavior to Union but to no avail. The only remedy Union would bother to enforce was to widen the proximity noted in the No Contact Order, an order which Assaulter Smith repeatedly and unabashedly violated time and time again.

133.     Assaulter Smith was so bold on campus that he even began to stalk Plaintiff around Union, and was videotaped by Union security following closely behind Plaintiff as she navigated Union's campus for an extended period of time.

134.     Despite being caught by Union security, upon information and belief, no disciplinary action was taken against Assaulter Smith.

135.     Seeing that Union was not going to do anything to curve his behavior, Assaulter Smith became ever more emboldened and, on one occasion, walked directly up to Plaintiff, groped her buttocks, and whispered into her ear "You're still mine."

136.     Plaintiff immediately reported this incident to campus safety and Coordinator Kelley. Appallingly, in response to Plaintiff's report that Assaulter Smith not only violated the No Contact Order again but had also physically assaulted her, Coordinator Kelley simply told Plaintiff that she did not believe her.

137.     As a result of the ongoing harassment, as well as Union's clear disinterest in protecting Plaintiff, Plaintiff was forced to leave and de-enroll from Union.

## CAUSES OF ACTION
## AS AND FOR A FIRST CAUSE OF ACTION
*(Discrimination in violation of Title IX: Hostile Education Environment –*
*Sexually Hostile Culture)*

138.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

139.     As set forth in detail above, Defendants actively created and/or condoned and/or were deliberately indifferent to a culture of sexual hostility and violence against women by instituting policies and permitting practices that included, but were not limited to: (i) purposefully ignoring and/or condoning a social culture of sexual violence and harassment against female students; (ii) intentionally ignoring and/or delaying investigation(s) of complaints of sexual

misconduct and rape perpetrated against its female students; (iii) failing to fulfill their obligations as mandatory reporters following receipt of complaints of sexual misconduct and/or sexual assault and/or sexual harassment; (iv) failing to objectively and sufficiently investigate complaints of sexual misconduct and/or sexual assault and/or sexual harassment; (v) intentionally misrepresenting evidence gathered during investigations into complaints of sexual misconduct and/or sexual assault; (vi) failing to proffer equal opportunities to female complainants during the investigation and/or adjudication of complaints of sexual misconduct and/or sexual assault; (vii) enforcing a policy and practice of ignoring violations of No Contact Orders leading to the subjection of Union's female populace to ongoing sexual harassment; (vii) providing male students accused of sexual misconduct and/or sexual assault unwarranted leniency in the adjudication of Title IX complaints brought by female students; and (ix) permitting male students accused of sexual misconduct to continue to harass victims of sexual assault.

140.   Defendants' sexually hostile policies and practices were a proximate cause of Plaintiff's subjection to months of sexual harassment in the form of (i) sexual assault by one of Union's male students; (ii) a hostile educational environment; and (iii) ongoing and prolonged harassment of Plaintiff by other students and her accused rapist.

141.   The sexual harassment that Plaintiff suffered was so severe, pervasive, and objectively offensive that it effectively barred her access to educational opportunities and benefits from Defendant Union.

142.   As a direct and proximate result of Defendants' creation of and deliberate indifference to its sexually hostile educational environment, Plaintiff suffered damages and injuries for which Defendants are liable.

## AS AND FOR A SECOND CAUSE OF ACTION
*(Gender Discrimination in violation of Title IX: Deliberate Indifference to Plaintiff's Rape)*

143.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

144.    Title IX prohibits federally-funded institutions such as Defendant Union from engaging in discrimination on the basis of sex.

145.    Sexual harassment is included within the meaning of "discrimination" under Title IX.

146.    Sexual harassment of a student creates a hostile environment if the conduct is sufficiently severe that it denies or limits a student's ability to participate in or benefit from educational programs.

147.    A single instance of rape is sufficiently severe to create a hostile education environment.

148.    Title IX requires universities to promptly investigate student complaints of sexual harassment, and to take interim measures to ensure that its students are not subjected to a hostile education environment. The failure to do so amounts to "deliberate indifference" for which Defendants may be held liable under Title IX.

149.    Defendants' failure to promptly and objectively investigate the Assault, conduct a timely and unbiased investigation and hearing, or find Assaulter Smith responsible for the Assault was intentional and unreasonable.

150.    Defendants' further failure to (i) investigate Assaulter Smith's ongoing violations of the No Contact Order; (ii) continued sexual harassment of Plaintiff on Union's campus; (iii) investigate Plaintiff's complaint that she was further harassed and physically assaulted by Assaulter Smith was intentional and unreasonable.

151.    Defendants' actions, and/or lack thereof, constitute "deliberate indifference" in violation of Title IX.

152.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and Defendants' violations of Title IX, Plaintiff was exposed to continued harassment by Assaulter Smith and others which sexual harassment was so severe, pervasive, and objectively offensive that it effectively barred Plaintiff equal access to meaningful educational opportunities and benefits including, but not limited to, academics, on campus events and activities, and extracurricular activities.

153.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and sexual harassment, and Defendants' violations of Title IX, Plaintiff was subjected to a hostile education environment while attempting to pursue her education on Defendant Union's campus forcing her to de-enroll as a student at Union.

154.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and Defendants' violations of Title IX, Plaintiff has suffered and continues to suffer significant, severe, and ongoing emotional distress and mental anguish.

155.    As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's rape and Defendants' violations of Title IX, Plaintiff suffered damages and injuries for which Defendants are liable.

## AS AND FOR A THIRD CAUSE OF ACTION
*(Negligence)*

156.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

157.    Defendants owed a duty of reasonable care to protect Plaintiff from a sexually hostile environment which Defendants fostered and that was foreseeable.

158.    Defendants knew, or should have known, of the serious risk of sexual harassment and assault that was occurring on Defendant Union's campus, and knew or should have known of the risk of sexual violence toward their female students.

159.    The aforementioned sexually hostile policies of Defendants made the likelihood of sexual violence toward Defendant Union's female students foreseeable.

160.    Defendants further had a duty of care and loyalty to institute its practices and procedures, including but not limited to the Policy and the Administrative Policy, in a fair, equitable, reasonable, and unbiased manner.

161.    Defendants breached their duty to Plaintiff through its aforementioned sexually discriminatory policies, practices, and actions, without any regard for the safety of women like Plaintiff at Union. Defendants further breached their duty to Plaintiff by way of failing to properly investigate and adjudicate Plaintiff's Title IX Complaint in compliance with the Policy and/or the Administrative Policy.

162.    As a direct and proximate result of Defendants' breach(es), Plaintiff suffered damages and injuries for which Defendants are liable under New York State Common Law.

## AS AND FOR A FOURTH CAUSE OF ACTION
*(Breach of Implied and/or Express Contract)*

163.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

164.    Based on the aforementioned facts and circumstances, Defendants created express and implied contracts when Plaintiff was accepted as a student at Union.

165.    Plaintiff at all times was expected to adhere to Defendant Union's internal policies and procedures, including, but not limited to, the Policy, and at all times did so adhere to such policies and procedures.

166.    In contrast, Defendants were required to adhere to and implement the College's policies and procedures, the Policy, including but not limited to the Policy as defined and outlined above.

167.    During the Title IX process, Defendants intentionally and repeatedly failed to abide by the Policy to the direct detriment of Plaintiff, thus causing Plaintiff significant damages.

168.    Based on the foregoing facts and circumstances, Defendants breached their express and/or implied agreement(s) with Plaintiff and are liable to Plaintiff for damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## DEMAND FOR A JURY TRIAL

169.    Pursuant to FRCP 38(b), Plaintiff hereby demands a trial by jury on all claims.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against Defendants as follows:

(i)    An Order enjoining Defendants, along with their agents, employees, and those acting in concert therewith, from unlawful discrimination on the basis of sex, including the failure to address, prevent and/or remedy sexual harassment;

(ii)    Injunctive relief required Defendant Union to redress its violations of Title IX, including: (1) instituting, with the assistance of outside experts, and enforcing a comprehensive sexual harassment policy; (2) distributing written policies to all students describing prohibited activities and conduct and the consequences for violations; and (3) providing for annual, independent review by outside reviewers of Defendants' compliance with sexual harassment policies and Title IX guidance;

(iii)    An award of damages against Defendants on Plaintiff's claims one through five, as outlined above, including, without limitation, reimbursement of and prepayment for all of Plaintiff's tuition or related expenses; payment of Plaintiff's expenses incurred as a consequence of the sexual assault; damages for deprivations of the equal access to the education benefits and opportunities provided by Defendants; and damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish, and loss of past, present, and future earnings and enjoyment of life in an amount to be determined at trial;

(iv)    Punitive and/or exemplary damages against Defendants;

(v)    Statutory pre- and post-judgment interest on all sums awarded;

(vi)    An award of costs and attorneys' fees; and

(vii)    Any other relief the Court finds just and proper.

**Dated: New York, New York**
**July 26, 2019**

                          **NESENOFF & MILTENBERG, LLP**
                          **Attorneys for Plaintiff**

**By:**    **/s/ Andrew Miltenberg**
             **Andrew T. Miltenberg, Esq.**
             **Gabrielle M. Vinci, Esq.**
             **363 Seventh Avenue, Fifth Floor**
             **New York, New York 10001**
             **(212) 736-4500**